# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STACEY BERBEREIA, individually and on behalf of the ESTATE OFALBERT HANSON, JR., DANIEL HANSON, and KIMBERLY NIZ,<br><br>        **Plaintiffs,**<br><br>    v.<br><br>COUNTY OF KINGS; DEPUTY TAYLOR LOPES; DETECTIVE MARIUS BARSTECEANU; DEPUTY THOMAS OLSON; UNKNOWN LAW ENFORCEMENT OFFICERS,<br><br>        **Defendants.** | CASE NO. 1:16-CV-00363-LJO-SKO<br><br>**MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>**(ECF No. 26)** |

## I. <u>INTRODUCTION</u>

This case arises from the shooting death of Albert Hanson, Jr. ("Hanson" or "the Decedent") in an unincorporated area of Kings County. The Decedent's surviving children – Stacey Berbereia, Daniel Hanson, and Kimberly Niz (collectively, "Plaintiffs") – bring claims individually and on behalf of their late father's estate. Plaintiffs bring the instant civil rights action against the County of Kings ("County"), Kings County Deputy Taylor Lopes ("Lopes"), Kings County Sergeant Marius Barsteceanu, Kings County Deputy Thomas Olson (collectively, "Deputy Defendants"), and unknown law enforcement officers (collectively, "Defendants"), alleging excessive force under 42 U.S.C. § 1983, as well as state law causes of action for civil rights violations, battery, negligence, and wrongful death. Before the Court is Defendants' motion for summary judgment. The Court deems the matter appropriate for resolution without oral argument. *See* E.D. Cal. Civ. L.R. 230(g). Having carefully considered the record in this case, the parties' briefing, and the relevant law, the Court grants in part and denies in part Defendants'

motion.

## II. BACKGROUND

### A.     FACTUAL BACKGROUND[1]

#### 1.     The Decedent

On April 26, 2015, Albert Hanson, a 76-year old man from Visalia, California drove to the area of 7th Avenue and Kansas Avenue in unincorporated Kings County. Hanson had been to known to visit the area to shoot squirrels and had the permission of the previous owner of the property to hunt there. Ex. 3, Deposition of Daniel Hanson ("Daniel Dep.") 37:24–41:7. Hanson was driving a Ford Bronco and had two rifles with him in the vehicle.

Hanson was an insulin-dependent diabetic, who normally carried insulin with him. Daniel Dep. 23:20–24:16. According to later autopsy reports, Hanson's blood sugar dropped dangerously low, and he was likely suffering from a diabetic episode at the time of the incident. Ex. 2, Autopsy Report of Albert Hanson, Jr. ("Autopsy Report"), at 2.

#### 2.     KCSO Arrives At The Scene

In the afternoon, the Kings County Sheriff's Office ("KCSO") was informed that there was a person in a Ford Bronco parked near the intersection of Kansas Avenue and 7th Avenue who appeared to be intoxicated and was in possession of two guns. KCSO was further informed that the farmworker who approached the vehicle observed the subject reaching for one of his rifles as he approached. KCSO Deputy Leonel Alvarez responded to the scene at approximately 3:52 p.m. California Highway Patrol helicopter "H-40" was already at the scene. The area is primarily agricultural, with a few residences. The Bronco was parked facing the southwest. There was a house positioned to the southwest of the

---

[1] Unless otherwise indicated, the facts set forth in this section are drawn from facts asserted by Defendants in their statement of undisputed facts and explicitly undisputed by Plaintiffs in their response to Defendants' undisputed facts. Plaintiffs' Statement of Disputed and Undisputed Facts ("UF"), ECF No. 34-1.

Bronco (in front and to the right) and one to the north (rear) of the Bronco.[2] Deputy Alvarez parked 15 to 20 yards behind the Bronco.

Deputy Alvarez and H-40 used their public address systems to command Hanson to exit the vehicle. Hanson did not comply with the instructions. Several other deputies arrived at the scene. The deputies continued to sound their sirens and give commands for Hanson to exit the vehicle over the public address system. Hanson appeared to turn to his right from time to time and look in the direction of the deputies, but he did not comply with their instructions. At some point, Deputy Alvarez saw the subject reach toward the passenger side of the vehicle and lift a rifle scope. Noting that there were individuals in the surrounding homes who could not be safely evacuated, and that the subject in the vehicle appeared to be in possession of high-powered hunting rifles, the KCSO SWAT team was called to the scene.

### 3.    KCSO SWAT Team Arrives At The Scene

Sergeant Barsteceanu, the SWAT team leader, responded in the SWAT team's armored personnel carrier ("APC").[3] He arrived at approximately 5:02 p.m. and parked the APC approximately 20 to 40 yards behind the Bronco. Non-SWAT deputies were instructed to retreat to safety due to the fact that they were less well-equipped than the APC and the SWAT team to withstand high velocity rifle fire. Sergeant Barsteceanu made commands over the APC's public address system ordering the subject to exit the Bronco, and sounded the APC's siren to get his attention. There was no apparent response to those efforts, although the subject was observed to be moving around in the vehicle. Deputy Olson and Deputy Lopes also arrived at the scene. Deputy Lopes, Deputy Olson, and Sergeant Barsteceanu positioned themselves around the APC, with Deputy Lopes standing on the running board in the

---

[2] The parties dispute how far away the homes were from the Bronco. Plaintiffs contend that each house was approximately 100-150 yards away, while Defendants estimate each house was 50-100 yards away. The exact distance of the houses from the vehicle is not material to the Court's determination here.

[3] The parties disagree over whether the APC is "bulletproof." Defendants argue that the APC is not guaranteed to withstand rifle fire, while Plaintiffs contend that the APC is "capable of resisting or absorbing the impact of a bullet – the common definition of the term 'bulletproof.'" The dispute is not material to the Court's determination here.

3

doorjamb of the driver's side front door, Sergeant Barsteceanu positioned in the same way on the passenger side, and Deputy Olson in the turret of the APC. All three Deputy Defendants were armed and wearing body armor. From the APC, the interior of the Bronco was visible through the tailgate window and illuminated due to the position of the sun, despite the fact that there was a slight tint to the rear window. The deputies had a clear view of the subject's head, upper torso, shoulders, and arms through the tailgate window.

### 4. CHP Officer Manning Arrives In Aircraft (Air 43)

Air 43, a fixed wing aircraft manned by CHP Officer Dusty Manning, arrived in the area after receiving a call from H-40 that there was a subject in possession of rifles in the area of Kansas Avenue and 7th Avenue. Air 43 is equipped with a camera mounted under the left wing. Air 43 began orbiting the scene, and Officer Manning focused the camera on the vehicle and made radio contact with deputies on the ground. Officer Manning observed the events on the ground through a monitor in Air 43 that was connected to the camera. The camera recorded the events, and the recording matches what Officer Manning saw while observing the events through the aircraft's monitor.[4]

### 5. Defendants' Account Of The Shooting

At approximately 5:20 p.m., roughly eighteen minutes after Sergeant Barsteceanu arrived with the APC, each of the three Deputy Defendants assert that they saw the subject lift the rifle, put the buttstock toward his upper body, turn to his right so that he faced the rear of the Bronco, and point the muzzle in their direction. Barsteceanu Decl. ¶ 13; Olson Decl. ¶ 6; Lopes Decl. ¶ 7. Each of the three Deputy Defendants state that they feared for his life, and all three fired their rifles nearly simultaneously, with Deputy Lopes firing the first shot. *Id.* At the same time that Sergeant Barsteceanu saw the subject point the rifle at the Deputy Defendants, he heard a shot that he thought had come from the subject. Barsteceanu Decl. ¶ 13. It is undisputed that Mr. Hanson never fired his weapon. Sergeant Barsteceanu

---

[4] Attached as Exhibit 1 to the Declaration of Richard Oliver (ECF No. 26-7) is a copy of the video recording (including audio), and thereby an accurate depiction of what Officer Manning observed.

yelled "cease fire" when it appeared that the subject and the rifle went down in the driver's seat, thereby minimizing the threat posed. Sergeant Barsteceanu drove the APC closer to the Bronco to provide additional cover in case the subject was still capable of shooting at the Deputy Defendants. Deputy Defendants exited the vehicle with their weapons drawn and approached the Bronco on foot.

### 6. Other Accounts Of The Shooting

Officer Manning saw the subject handling a rifle in the vehicle, especially toward the end of the incident. He observed the barrel of the rifle point towards the right passenger side of the vehicle, and then towards the front of the vehicle (the opposite direction of the officers). UF 145. Officer Manning then saw a single gunshot come through the Bronco's front windshield, followed after a brief pause by multiple shots. UF 143-44; Ex. 10, Manning Dep. 18:4-21, 22:3-25. Officer Manning did not see the weapon pointed back towards the officers prior to the first shot coming through the front windshield. Manning Dep. 22:3-25. Defendants' forensic video analysis expert, Michael G. Schott, also testified that the video shows the Decedent was turning towards the front of the vehicle in a counterclockwise direction – away from the Deputy Defendants – when the first shot is seen coming through the front windshield. Ex. 15, Schott Dep. 38:3–40:4.

### 7. Undisputed Facts Regarding The Shooting

At approximately 5:20 p.m., the three Deputy Defendants fired a total of 46 rounds through the rear of the vehicle. Hanson was struck 11 times. When the deputies reached the vehicle and opened the door, Hanson was holding the rifle, but had suffered significant head trauma and was clearly deceased.

## B. PROCEDURAL HISTORY

Defendants moved for summary judgment on all causes of action on January 5, 2018. ECF No. 26. Plaintiffs filed an opposition on February 27, 2016, ECF No. 34, to which Defendants filed a reply on March 7, 2018, ECF No. 36. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, and 1367. Venue is proper in this court, and the matter is ripe for review.

### III. <u>STANDARD OF DECISION</u>

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. At summary judgment, a court's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The Court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence. *See id.* at 255; *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). But if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *See id.* at 249-50. A fact is "material" if its proof or disproof is essential to an element of a plaintiff's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A factual dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted). The moving party bears the initial burden of informing the Court of the basis for its motion, and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact for trial. *Celotex*, 477 U.S. at 323. If the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, set forth specific facts showing that there is some genuine issue for trial in order to defeat the motion. *See* Fed. R. Civ. P. 56(c); *Liberty Lobby, Inc.*, 477 U.S. at 250.

### IV. <u>DISCUSSION</u>

In their motion, Defendants argue that Deputy Defendants' use of lethal force was objectively reasonable as a matter of law because they were responding to an immediate threat. Plaintiffs counter that there is a material dispute of fact about whether Deputy Defendants were reasonably threatened by Albert Hanson's conduct. Because the Court agrees that there is a material dispute about exactly what

precipitated the shooting of Mr. Hanson, summary judgment is denied as to the first, second, fourth, fifth, and sixth causes of action. As to the third cause of action for municipal liability, the Court concludes that Plaintiffs have not set forth sufficient evidence that the municipality engaged in a practice or custom of failing to supervise or discipline its officers. Therefore, the Court grants summary judgment for Defendant Kings County as to the third cause of action.

## A.     FOURTH AMENDMENT: EXCESSIVE FORCE

### 1.     Legal Standard

42 U.S.C. § 1983 provides a cause of action for the deprivation of "rights, privileges, or immunities secured by the Constitution or laws of the United States" by a person acting "under color of any statute, ordinance, regulation, custom, or usage." *Gomez v. Toledo*, 446 U.S. 635, 638-39 (1980). To succeed in asserting the § 1983 claims, Plaintiffs must demonstrate that the action (1) occurred "under color of state law," and (2) resulted in the deprivation of a constitutional or federal statutory right. *Leer v. Murphy*, 844 F.2d 628, 632-33 (9th Cir. 1988) (citations omitted); *see also West v. Atkins*, 487 U.S. 42, 48 (1988). As the moving party, Defendants bear the initial burden on summary judgment of pointing out "an absence of evidence to support [Plaintiffs'] case." *Celotex*, 477 U.S. at 325. It is also Defendants' burden to prove that they are entitled to qualified immunity. *Moreno v. Baca*, 431 F.3d 633, 638 (9th Cir. 2005).

Here, the parties agree that Defendants acted under color of state law, but dispute whether they violated the Decedent's Fourth Amendment rights.[5]

Under the Fourth Amendment, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause." U.S. Const. amend. IV. "The Fourth Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable."

---

[5] Plaintiffs' Fourth Amendment claims are brought on behalf of the Decedents' estate. Plaintiffs do not have standing to sue under the Fourth Amendment individually.

*Florida v. Jimeno*, 500 U.S. 248, 250 (1991) (citations omitted); *see also United States v. Chan-Jimenez*, 125 F.3d 1324, 1326 (9th Cir. 1997) ("For purposes of the Fourth Amendment, a seizure occurs when a law enforcement officer, by means of physical force or show of authority, in some way restrains the liberty of a citizen.").

The Fourth Amendment requires law enforcement officers making an arrest to use only an amount of force that is objectively reasonable in light of the circumstances facing them. *Tennessee v. Garner*, 471 U.S. 1, 7-8 (1985). The reasonableness of a particular use of force is determined through a three-step inquiry. *Graham v. Connor*, 490 U.S. 386, 396 (1989). In the *Graham* analysis, a court must "first assess the quantum of force used to arrest [the plaintiff] by considering 'the type and amount of force inflicted.'" *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1056 (9th Cir. 2003) (citations omitted).

The second step is to determine the government's countervailing interests at stake. *Graham,* 490 U.S. at 396. "Relevant factors to this inquiry include, but are not limited to, 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Blankenhorn v. City of Orange*, 485 F.3d 463, 477 (9th Cir. 2007) (quoting *Graham*, 490 U.S. at 396). The most important of these three factors is whether the suspect poses an immediate threat to the safety of the officers or others. *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) (en banc). The *Graham* factors, however, are not exhaustive. *George v. Morris,* 736 F.3d 829, 837-38 (9th Cir. 2013). Because "there are no per se rules in the Fourth Amendment excessive force context," *Mattos*, 661 F.3d at 441, courts are to "examine the totality of the circumstances and consider 'whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*.'" *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010) (citations omitted). "Other relevant factors include the availability of less intrusive alternatives to the force employed, whether proper warnings were given[,] and whether it should have been apparent to officers that the person they used force against was emotionally disturbed." *Glenn v. Washington*

*County*, 673 F.3d 864, 872 (9th Cir. 2011) (citations omitted).

"The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396 (1989) (citing *Terry v. Ohio*, 392 U.S. 1, 20-22 (1968)); *see id.* at 396-97 ("'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' . . . violates the Fourth Amendment.") (citations omitted). This is because "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.*

Finally, a court must weigh in balance "whether the degree of force used was warranted by the governmental interest at stake." *Deorle v. Rutherford*, 272 F.3d 1272, 1282 (9th Cir. 2001). In this way, a court may determine whether the force used was "greater than is reasonable under the circumstances." *Santos v. Gates*, 287 F.3d 846, 854 (9th Cir. 2002); *see also Young v. County of Los Angeles*, 655 F.3d 1156, 1161 (9th Cir. 2011) (a court must "balance the gravity of the intrusion on the individual against the government's need for that intrusion to determine whether it was constitutionally reasonable" (quoting *Miller v. Clark County*, 340 F.3d 959, 964 (9th Cir. 2003)). But "even where some force is justified, the amount actually used may be excessive." *Id.* at 853. The question in all cases is whether the use of force was "objectively reasonable in light of the facts and circumstances confronting" the arresting officers. *Graham*, 490 U.S. at 397 (internal quotation marks omitted). "Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (internal citations and quotations omitted).

"[T]he reasonableness of force used is ordinarily a question of fact for the jury." *Liston v. County of Riverside*, 120 F.3d 965, 976 n.10 (9th Cir. 1997). "Because the excessive force inquiry nearly always

9

requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, [the Ninth Circuit has] held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." *Avina v. United States*, 681 F.3d 1127, 1130 (9th Cir. 2012) (internal quotation marks and citations omitted). The Ninth Circuit has cautioned that excessive force cases pose "a particularly difficult problem" where cases involve the suspect's death, because "the witness most likely to contradict [an officer's] story" is not available to testify. *Gonzalez v. City of Anaheim*, 747 F.3d 789, 794-95 (9th Cir. 1994) (internal quotation marks and citations omitted). In such cases the evidence should be carefully examined "to determine whether the officer's story is internally consistent and consistent with other known facts." *Id.* at 794-95 (internal quotation marks and citations omitted); *see also Long v. Johnson*, 736 F.3d 891, 896 (9th Cir. 2013) (explaining that "we must respect the exclusive province of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts" (internal quotation marks and brackets omitted)). The Ninth Circuit has held that "summary judgment should be granted sparingly" in such cases. *See id.* (citing *Glenn*, 673 F.3d at 871).

## 2. **Application**

Construing the facts in the light most favorable to the non-moving party, Decedent was not committing a serious crime when the shooting occurred. According to Plaintiffs' version of the incident, he was trespassing and passively resisting arrest by failing to comply with police instructions. Therefore, the first *Graham* factor (the severity of the crime at issue) and the third *Graham* factor (whether the subject was actively resisting arrest or attempting to evade arrest by flight) weigh in his favor. 490 U.S. at 396; *see also Lopez ex rel. Lopez v. Gelhaus*, 871 F.3d 998, 1006 (9th Cir. 2017) (concluding that the first and third factors weighed in the decedent's favor where he failed to turn around when ordered to do so by police and was not committing a crime at the time of the stop). The issue here rests almost entirely on the second, and most important, *Graham* factor – whether the Decedent posed an immediate threat to the safety of the officers or others sufficient to justify the use of deadly force. *See Mattos*, 661 F.3d at

441 (explaining that the second *Graham* factor is the most important). Defendants argue that the evidence is uncontroverted that the Decedent pointed a high power firearm in their direction, putting them in imminent fear of severe bodily harm.

Plaintiffs counter that there is significant circumstantial evidence that the Decedent did not pose such a threat at the time that the first shot was fired by the officers. Plaintiffs point to the testimony of Officer Manning that the Decedent's rifle was pointed in the direction of the windshield – not Deputy Defendants who were positioned to the rear – at the time that the rifle was fired. Likewise, Plaintiffs cite Defendants' expert's conclusion that the Decedent was turning away from the Defendants at the time that the first shot went through the windshield as evidence that the Decedent was not pointing his gun at officers when the shooting started. Lastly, Plaintiffs point out that all eleven shots that hit the Decedent penetrated his back side (shoulders, neck and the back of his head).

Defendants' argument that the Decedent posed an imminent threat to officer safety rests largely on the self-serving testimony of three shooting officers. The Ninth Circuit has admonished that "in the deadly force context, we cannot simply accept what may be a self-serving account by the police officer." *Cruz*, 765 F.3d at 1079 (internal quotation marks and citations omitted). Moreover, on a summary judgment motion, the facts must be viewed in the light most favorable to the nonmoving party. *Davis v. United States*, 854 F.3d 594, 598 (9th Cir. 2017). Here, at least some of the determination also rests on the credibility of the Deputy Defendants, which is an issue of fact for the jury to resolve. *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 520 (1991) ("[W]e must draw all justifiable inferences in favor of the nonmoving party, including questions of credibility and of the weight to be accorded particular evidence.").

The Court concludes that Defendants have not met their burden of showing that there is no material dispute of fact that the officers' use of force was reasonable under the totality of the circumstances. If the Decedent did not point the gun at the officers and "was not facing them when they shot him for the first time," a jury could reasonably conclude that the use of deadly force was not

reasonable. *Curnow ex rel. Curnow v. Ridgecrest Police Dep't*, 952 F.2d 321, 325 (9th Cir. 1991) (rejecting summary judgment where the suspect had a gun, but was not pointing it at the officers and was not facing the officer who opened fire); *Longoria v. Pinal County*, 873 F.3d 699, 706-07 (9th Cir. 2017) (dispute of fact regarding whether suspect assumed a threatening "shooter's stance" in interaction with officers precluded summary judgment). The Ninth Circuit's decision in *Gelhaus* is also instructive. The decedent in *Gelhaus* was a 13-year old boy who was carrying what appeared to be an AK-47 in the middle of the day in a residential neighborhood. After the officers yelled "drop the gun," the decedent began to turn around "naturally in a clockwise direction" while still holding the gun. 871 F.3d at 1010-11. The parties agreed that the gun barrel might have raised slightly as the decedent turned, but was still not raised enough to threaten the officers, and the officers did not see the decedent's hand on the trigger. *Id.* at 1011. One officer fired and fatally struck the decedent. The Court held, on these facts, that a reasonable jury could find that the use of lethal force was excessive, and that the officer reasonably should have known that the application of deadly force under the circumstances was excessive under the Fourth Amendment.

Defendants' assertion that the Decedent was facing the officers and pointing his rifle right before he was shot is hotly disputed in this case. Although all three Deputy Defendants maintain that they saw the Decedent turn towards them and point the rifle, other facts in the record could lead the jury to conclude otherwise. First, there is the uncontroverted evidence that the Decedent was shot only in the back. Autopsy Report at 12. A reasonable jury could infer from that fact that the Decedent was facing forward at the time that the officers fired and therefore did not pose an imminent threat to officer safety. Likewise, a reasonable jury could credit Officer Manning's testimony that the Decedent was facing forward and had the rifle pointed in the opposite direction of the Deputy Defendants when the first shot became visible through the windshield. Manning Dep. 22:3-25. They could infer from that fact, along with the undisputed testimony that the officers had good visibility of the subject through the rear window, that the Decedent did not pose a threat at the time that he was shot. They could likewise credit

the forensic expert's testimony that the Decedent was moving the rifle in a counterclockwise direction – away from the officers – as the first became visible on the video footage. Schott Dep. 38:3–40:4. From that testimony, they could infer that the Decedent did not pose a threat. A reasonable jury could conclude that the Deputy Defendants' testimony that the Decedent pointed his rifle in their direction is self-serving and not credible. A reasonable jury could also determine, based on the video evidence, that the pause between when the first shot appeared to penetrate the windshield and the appearance of the remaining shots is inconsistent with the Deputy Defendants' account that they all shot simultaneously. The direction that the Decedent was facing and how he was holding his rifle at the time that he was shot are disputed facts and the record provides support for multiple interpretations and conclusions. These facts are also material, indeed critical, to the underlying question of whether the officers' use of force was reasonable.

Defendants argue that none of Plaintiffs' evidence affirmatively establishes that the Decedent was facing forward and therefore did not pose a threat to officer safety when the first shots were fired. Therefore, according to Defendants, Plaintiffs they cannot meet their burden of persuasion at trial.[6] Defendants misconstrue the law and the Plaintiffs' burden as the nonmoving party at summary judgment. Courts do not weigh countervailing evidence at summary judgment. *Masson*, 501 U.S. at 520. The factual issue presented here is firmly within the province of the jury, and cannot be determined as a matter of law. Plaintiffs contend that a number of other factual issues are in dispute, but because this

---

[6] Defendants also contend that lethal force was justified even if the Decedent's raised rifle pointed in the direction of the front window because there were occupied residences in that general direction and the police helicopter was flying overhead. However, that assertion is inconsistent with the Deputy Defendants' testimony. Defendants Barsteceanu and Olson each testified that they fired because they feared for their own *personal* safety, not the safety of others who may have been positioned in front of the vehicle. Ex. 9, Deposition of Marius Barsteceanu ("Barsteceanu Dep.") 48:23–49:13; Ex. 8, Deposition of Thomas Olson 18:12–19:10. Defendant Lopes likewise testified that he was motivated to shoot out of fear for his own safety, and the safety of others, as he perceived that the rifle was coming towards him. Ex. 7, Deposition of Taylor Lopes ("Lopes Dep.") 53:12-23; 75:18–76:12. Defendants are not entitled to summary judgment on a legal theory that conflicts with their own testimony. Moreover, the Decedent was manipulating his rifle –despite the presence of the home towards the front of the vehicle and the presence of the H-40 helicopter and Air 43 aircraft – for at least an hour prior to the time that Deputy Defendants fired shots. *See* Ex. 6, Deposition of Tyrus Milton 12:13-18:9 (defendant had been moving around and manipulating the rifle at various times for over an hour). If Deputy Defendants sensed a danger to others from the Decedent facing forward and manipulating his rifle prior to the fatal shooting, they did not act on it at that point. A reasonable jury could therefore conclude that the officers did not base their decision to shoot on an immediate fear for the safety of others positioned in front of the vehicle.

issue alone precludes summary judgment, the Court need not go further. Because Plaintiffs demonstrate that genuine issues of material fact persist, summary judgment is inappropriate on Plaintiffs' Fourth Amendment claim.

### 3. **Qualified Immunity**

Qualified immunity is an affirmative defense that "shield[s] an officer from personal liability when an officer reasonably believes that his or her conduct complies with the law." *Pearson v. Callahan*, 555 U.S. 223, 244 (2009). The doctrine "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Id.* at 231 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Further, it "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* "The protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" *Id.* Because qualified immunity is an affirmative defense, the defendant bears the burden of establishing entitlement to it. *Gomez*, 446 U.S. at 640. The burden lies with Plaintiffs to prove "that the right allegedly violated was clearly established at the time of the official's allegedly impermissible conduct." *Camarillo v. McCarthy,* 998 F.2d 638, 640 (9th Cir. 1993).

To determine whether officers are entitled to qualified immunity, a court conducts a two-step inquiry. "The threshold inquiry in a qualified immunity analysis is whether the plaintiff's allegations, if true, establish a constitutional violation." *Wilkins v. City of Oakland*, 350 F.3d 949, 954 (9th Cir. 2003) (citations omitted). If the alleged conduct would not be considered violative, the inquiry stops and the defense of qualified immunity applies. *See id.*

"Second, if the plaintiff has satisfied this first step, the court must decide whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson*, 555 U.S. at 231. To be a clearly established constitutional right, a right must be sufficiently clear "that every reasonable

official would [have understood] that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (citation and internal quotation marks omitted). "[T]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202; *see also Walker v. Gomez*, 370 F.3d 969, 978 (9th Cir. 2004). This inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* at 201. "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, . . . but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (citations omitted).

"Consequently, at summary judgment, an officer may be denied qualified immunity in a Section 1983 action 'only if (1) the facts alleged, taken in the light most favorable to the party asserting injury, show that the officer's conduct violated a constitutional right, and (2) the right at issue was clearly established at the time of the incident such that a reasonable officer would have understood [his] conduct to be unlawful in that situation.'" *Hughes v. Kisela*, 862 F.3d 775, 783 (9th Cir. 2016) (citation omitted), *as amended* (June 27, 2017).

Here, the Court has already determined that the facts, taken in the light most favorable to Plaintiffs, show that the officers unreasonably used excessive force in shooting the Decedent. Therefore, the only question that remains is whether that right was clearly established at the time of the incident. In *Gelhaus*, the Ninth Circuit concluded that, in 2013, case law clearly established that an officer's use of deadly force against an armed individual who was not pointing a weapon at the officer violated the Fourth Amendment.[7] 871 F.3d at 1018-21 (citing *George v. Morris*, 736 F.3d 829 (9th Cir. 2013)).

---

[7] *Gelhaus* was decided after the relevant incident in this case, and therefore the circumstances described in that case are not relevant to this Court's discussion of whether the law was clearly established at the time of the April 2015 shooting death of Mr. Hanson. However, the *Gelhaus* court's explanation of the law in 2013 (prior to this incident) is still instructive. Specifically, the Court looks to the *Gelhaus* court's determination that the case law as of 2013 clearly established that an officer's use of deadly force against an armed individual who was not pointing a weapon at the officer violated the Fourth Amendment.

Likewise, in *Curnow*, the court concluded that "[u]nder [non-moving party's] version of the shooting, the police officers could not reasonably have believed the use of deadly force was lawful because [the decedent] *did not point the gun at the officers and apparently was not facing them when they shot him the first time*." *Curnow*, 952 F.2d at 325 (emphasis added).

Here, viewing the facts in this case in the light most favorable to Plaintiffs, Deputy Defendants used lethal force against the Decedent, who was facing away from them and did not pose an immediate threat to their safety. Under those circumstances, and considering the prevailing law at the time as set forth in *Curnow* and described in *Gelhaus*, Deputy Defendants could not reasonably have believed that the use of deadly force was lawful. Therefore, Defendants are not entitled to qualified immunity.

**B.  FOURTEENTH AMENDMENT: FAMILIAL ASSOCIATION**

Parents and children may assert Fourteenth Amendment substantive due process claims if they are deprived of their liberty interest in the companionship and society of their child or parent through official conduct. *See Lemire v. Cal. Dep't of Corrections & Rehabilitation*, 726 F.3d 1062, 1075 (9th Cir. 2013) (parents and children); *Curnow*, 952 F.2d at 325 (parent). "[T]he Due Process Clause is violated by executive action only when it can be properly characterized as arbitrary, or conscience shocking, in a constitutional sense." *County of Sacramento v. Lewis*, 523 U.S. 833, 845-47 (1998) (internal quotation marks and citations omitted); *see Lemire*, 726 F.3d at 1075. "Where actual deliberation is practical, then an officer's 'deliberate indifference' may suffice to shock the conscience." *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010). "On the other hand, where a law enforcement officer makes a snap judgment because of an escalating situation, his conduct may only be found to shock the conscience if he acts with a purpose to harm unrelated to legitimate law enforcement objectives." *Id.*

Defendants contend that the Deputy Defendants' decision to use deadly force "constituted a 'snap judgment' when Mr. Hanson presented an immediate deadly threat." ECF No. 26-1 at 23. However, the Court has already concluded that whether Mr. Hanson actually presented such a threat is a

disputed question of fact for the jury. Moreover, a reasonable jury could conclude that the 18 minutes

that the Deputy Defendants spent on the scene prior to shooting Mr. Hanson gave them sufficient time to

deliberate such that their behavior could be found to shock the conscience, if they conclude that Mr.

Hanson did not pose an immediate threat to the officers. Because the claim implicates a factual dispute,

Defendants' motion for summary judgment as to the second cause of action under the Fourteenth

Amendment is DENIED.

## C.  <u>MUNICIPAL LIABILITY</u>

A municipality cannot be held liable under § 1983 for the actions of its employees under the

theory of *respondeat superior. See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). A

municipality can only be held liable for injuries caused by the execution of its policy or custom or by

those whose edicts or acts may fairly be said to represent official policy. *Id.* at 694, 98 S.Ct. 2018. A

"policy" is a "deliberate choice to follow a course of action...made from among various alternatives by

the official or officials responsible for establishing final policy with respect to the subject matter in

question." *Fogel v. Collins*, 531 F.3d 824, 834 (9th Cir. 2008). "In addition, a local governmental entity

may be liable if it has a 'policy of inaction and such inaction amounts to a failure to protect

constitutional rights.'" *Lee v. City of Los Angeles*, 250 F.3d 668, 681 (9th Cir. 2001) (quoting *Oviatt v.*

*Pearce*, 954 F.2d 1470, 1474 (9th Cir. 1992)). More generally, a plaintiff must show the following: (1)

the plaintiff was deprived of a constitutional right; (2) the defendant had a policy or custom; (3) the

policy or custom amounted to deliberate indifference to the plaintiff's constitutional right; and (4) the

policy or custom was the moving force behind the constitutional violation. *Dougherty v. City of Covina*,

654 F.3d 892, 900 (9th Cir. 2011) (internal quotation marks and citations omitted); *Mabe v. San*

*Bernardino Cty.*, 237 F.3d 1101, 1110-11 (9th Cir. 2001).

Municipal liability under *Monell* may be premised on: (1) conduct pursuant to a formal or

expressly adopted official policy; (2) a longstanding practice or custom which constitutes the "standard

operating procedure" of the local government entity; (3) a decision of a decision-making official who

17

was, as a matter of state law, a final policymaking authority whose edicts or acts may fairly be said to represent official policy in the area of decision; or (4) an official with final policymaking authority either delegating that authority to, or ratifying the decision of, a subordinate. *See Thomas v. County of Riverside*, 763 F.3d 1167, 1170 (9th Cir. 2014); *Price v. Sery*, 513 F.3d 962, 966 (9th Cir. 2008). The Ninth Circuit has recognized that "a custom or practice can be 'inferred from widespread practices or evidence of repeated constitutional violations for which the errant municipal officers were not discharged or reprimanded.'" *Hunter v. County of Sacramento*, 652 F.3d 1225, 1233-35 (9th Cir. 2011) (citations omitted).

Here, Plaintiffs contend that the KCSO had a policy or custom of failing to discipline members of its force who deploy excessive force. In support of their argument, Plaintiffs point to the fact that none of the Deputy Defendants in this case were reprimanded for the use of lethal force against Mr. Hanson, and that the Kings County Sheriff went so far as to claim in the press that the video footage of the incident would exonerate his deputies. Plaintiffs posit that the KCSO's conduct is evidence that the municipality tolerates and protects deputies who use of excessive force. Plaintiffs also point to the fact that Defendant Barsteceanu was not reprimanded for a recent incident in which he used lethal force, even though the civil case regarding the incident resulted in a substantial settlement. Lastly, Plaintiffs note that Sergeant Barsteceanu and Deputy Lopes were each involved in several prior shootings without adverse consequences. ECF No. 34 at 13. According to Plaintiffs, these incidents demonstrate that the KCSO has a practice of failing to supervise its deputies in the use of deadly force.

Defendants counter that Plaintiffs do not provide any evidence to support their contention that the KCSO fostered a "culture of impunity" with respect to the use of deadly force. Defendants point out that Plaintiffs have not demonstrated that the use of deadly force in any prior incident warranted corrective measures or punishment of the officers involved. With respect to the civil rights settlement against Sergeant Barsteceanu referenced by Plaintiffs, Defendants argue that cases settle for many reasons, and the settlement cannot be construed as an admission of wrongdoing.

Here, Plaintiffs have not set forth sufficient evidence from which a reasonable juror could infer that the KCSO failed to supervise or discipline officers in the use of deadly force. Barsteceanu and Lopes each admitted to being involved in other shooting incidents in their depositions, but each Defendant states that the use of force was justified. *See* Barsteceanu Dep. 7:2–15:7; Lopes Dep. 5:14–8:15. Aside from the incident in which Barsteceanu was sued civilly, *see Estate of Crawley v. Robinson*, No. 1:13-cv-02042-LJO-SAB (E.D. Cal.), Plaintiffs provide no evidence that either Defendant used excessive force in connection with these shooting incidents. That both officers have used their service weapons in the line of duty is not evidence that the KCSO failed to train its deputies in the use of deadly force. Therefore, Plaintiffs have not provided any evidence to establish that the KCSO acted with deliberate indifference in failing to discipline its officers in connection with those incidents. With respect to the incident described in *Estate of Crawley*, a municipality's failure to take corrective action in response to excessive force incidents resulting in settlements could form the basis of a *Monell* failure to supervise claim. *See Vann v. City of N.Y.*, 72 F.3d 1040, 1051 (2d Cir. 1995) (focusing on the supervision of a particular problem officer and finding that summary judgment for the city was inappropriate where the evidence showed an "absence of any significant administrative response to [the problem officer's] resumption of his abusive misconduct upon reinstatement"); *Zartner v. City and County of Denver, Colorado*, 242 F. Supp. 3d 1168, 1174-75 (D. Colo. 2017) (allegation that single police officer had 17 excessive force complaints against him, some of which resulted in settlements, but that city failed to take corrective action with respect to that officer, was adequate to state claim that city had custom or policy involving inadequate supervision of its officers).

In *Garlick v. County of Kern*, 167 F. Supp. 3d 1117, 1175 (E.D. Cal. 2016), plaintiff brought a claim against the County based on inadequate training. The Court noted that "(1) in 2010, [the officer] was involved with an in-custody death of an individual, Jose Lucero; (2) [the officer] struck Lucero 15 times with his baton during the incident; (3) a jury returned a verdict for Lucero; and (4) [the officer] was not disciplined or re-trained following the incident or the lawsuit." *Id.* at 1174. However, the Court

concluded that there was insufficient evidence to support an inference that the municipality had a custom of failing to supervise or train its correctional officers based only on this incident and the instant complaint. *Id.*

Here, the Court concludes that the incidents presented in *Crawley* and in this case, even taking the facts in the light most favorable to Plaintiffs, are insufficient to establish that the KCSO had a policy or custom of failing to supervise its officers with respect to the use of deadly force. Although the Court could infer that there was some merit to the claim in *Estate of Crawley* giving rise to Barsteceanu's decision to settle, the municipality's failure to reprimand Barsteceanu following a lone civil settlement is not sufficient evidence that the municipality failed to supervise its officers. *Garlick*, 167 F. Supp. 3d at 1175; *see also Oyenik v. Corizon Health Inc.*, 696 F. App'x 792, 794 (9th Cir. 2017) (noting that "one or two incidents are insufficient to establish a custom or policy"); *Meehan v. County of Los Angeles*, 856 F.2d 102, 107 (9th Cir. 1988) (two incidents of nonintervention were insufficient to support a policy). Plaintiffs have not met their burden of showing that there is a genuine issue of material fact that the KCSO engaged in a "persistent and widespread" failure to supervise its officers in the use of deadly force. *Trevino v. Gates*, 99 F.3d 911, 918-19 (9th Cir. 1996) ("Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy."). Therefore, Defendants' motion for summary judgment is GRANTED as to the third cause of action for municipal liability.

**D.   STATE LAW CLAIMS: NEGLIGENCE, BATTERY, AND WRONGFUL DEATH**

Plaintiffs' state law claims for negligence, battery, and wrongful death rest on the same facts as the asserted excessive force claim. To prove these causes of action at trial, Plaintiffs must demonstrate that Defendants acted unreasonably under the totality of the circumstances. The Court concluded that a material issue of fact exists as to whether the Deputy Defendants behaved reasonably in using deadly force against the Decedent, noting that there is a factual dispute regarding whether the Decedent posed a

threat to the officers' safety. The Court denied Defendants' motion for summary judgment on the excessive force claim on that basis. Since the parties agree that the facts relevant to the state law claims are identical to those considered in the context of the Fourth Amendment claim, no further analysis is required. ECF No. 34 at 14; ECF No. 36 at 10; *see also Hayes v. County of San Diego*, 57 Cal. 4th 622, 629 (2013) (applying reasonableness standard to determine whether officer was negligent in using deadly force). There is a material issue of fact as to whether the officers' use of deadly force was reasonable that precludes summary judgment on Plaintiffs' state law claims. Defendants' motion for summary judgment as to the state law claims for negligence, battery, and wrongful death is DENIED.

**E.     PUNITIVE DAMAGES**

Punitive damages may be awarded in a § 1983 action "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Dang v. Cross*, 422 F.3d 800, 807 (9th Cir. 2005) (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1986)). A § 1983 punitive damages claim is subject to summary adjudication "where plaintiff fails to produce evidence raising a material question of act regarding aggravating circumstances or the reckless or callous nature of defendant's actions." *Megargee v. Wittman*, 550 F. Supp. 2d 1190, 1214 (E.D. Cal. 2008) (quoting *Kyle v. Patterson*, 196 F.3d 695, 698 (7th Cir. 1999)).

As explained above, the parties here each produce evidence giving rise to a material dispute of fact about whether the Decedent posed an immediate threat to the safety of the officers. Depending on how the jury determines the facts in this case, a reasonable juror could also conclude that one or more of the Deputy Defendants acted with reckless disregard to the Decedent's Fourth Amendment rights in using lethal force. Therefore, summary judgment is not appropriate on the issue of punitive damages, and Defendants' motion in that regard is DENIED.

# V. <u>CONCLUSION AND ORDER</u>

For the foregoing reasons, **IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment (ECF No. 26) is **GRANTED IN PART** and **DENIED IN PART:**

1. Defendants' motion for summary judgment as to the third cause of action for municipal liability is **GRANTED**;

2. Defendants' motion for summary judgment as to the remaining causes of action is **DENIED**.

IT IS SO ORDERED.

Dated:   __April 3, 2018__                    _____ **/s/ Lawrence J. O'Neill** _____
                                        UNITED STATES CHIEF DISTRICT JUDGE